**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

FILED
11/17/2026
U.S. DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
Kristine L. Seufert, Clerk

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**

**Plaintiff,**

**v.**

**BACKWARD HAT CAPITAL MANAGEMENT LLC, TPC MC, LLC d/b/a TRADERS POINT CAPITAL, PHILLIP P. WILLIAMS, DEVIN A. JOHNSON, and JOSEPH ANDERSON,**

**Defendants,**

**and**

**BACKWARD HAT CAPITAL FUND LP, BHC V LLC, KMAP INC., ALLEN JOHNSON GROUP LLC, WILLIAM HARVEY GROUP LLC, TRADERS POINT CAPITAL FX FUND I LP, TPC FX AMF, LP, DROPLIGHT LLC, and WILLIAM CODY HARVEY,**

**Relief Defendants.**

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Case No. 1:26-cv-2482-JPH-TAB

Plaintiff United States Securities and Exchange Commission ("SEC") alleges as follows:

## INTRODUCTION

1. The SEC brings this action against Defendants Backward Hat Capital Management LLC ("Backward Hat Capital"), TPC MC, LLC d/b/a Traders Point Capital ("Traders Point Capital"), Phillip P. Williams ("Williams"), Devin A. Johnson ("Johnson"), and Joseph Anderson ("Anderson") (collectively, "Defendants") to hold them accountable for their roles in a Ponzi-like scheme that raised more than $560 million from at least 2,000 investors

throughout the United States.

2. Backward Hat Capital and a web of other interrelated businesses under various iterations of the name "Backward Hat," "BH Capital," or "BHC" serve as the general partners and/or managing entities of private investment funds purporting to specialize in algorithmic high-frequency foreign exchange ("FX") trading, by buying and selling currencies simultaneously in pairs to profit from exchange rate fluctuations.

3. From at least July 2022 through the present (the "Relevant Period"), Backward Hat Capital, Williams, and Johnson, directly and through a network of promoters, sold investors limited partnership interests in a series of private funds (the "BHC Funds"), including to investors who were Williams's investment advisory clients. The limited partnership interests in the BHC Funds are investment contracts and thus securities under the federal securities laws as described below. Backward Hat Capital, Williams, and Johnson promised that investors' money would be converted to a crypto asset and then used to engage in FX arbitrage using a proprietary, "AI-driven" algorithm which purportedly always generated returns for investors of at least 6% per month.

4. Despite these claims, more than $470 million (over 83% of the money raised during the Relevant Period) was used to make Ponzi-like payments to previous investors (more than $250 million) or transferred to Backward Hat Capital's founders (or their entities) (more than $220 million), which helped fund their lifestyle, including, among other things, exotic cars, expensive homes, and private air travel, and helped fund other unrelated businesses owned by Williams and Johnson. These funds also helped support Johnson's gambling. In addition, general partners/promoters received more than $50 million of investors' funds.

5. Anderson's role in the fraudulent scheme was to create fake financial reports,

including at least two "audit reports" and a "quality of earnings" document from a purported third-party independent audit firm, for distribution to investors. Those documents falsely stated that the purported returns generated by the BHC Funds had been confirmed and verified through a review of bank and brokerage records. Despite these claims, Anderson and his company the Institute for Process Excellence ("IpX") do not perform financial audit work and were not independent and instead had significant financial interests in the scheme.

6. During the course of the scheme through January 27, 2025, Williams was an investment adviser, and thus had critical fiduciary obligations to his clients, including duties of loyalty and care, which imposed on him an affirmative duty of utmost good faith, and an obligation to provide his clients full and fair disclosure of all material facts. Through the conduct alleged below, Williams fell vastly short of these obligations.

7. Not satisfied with defrauding retail investors, since 2025, Johnson further expanded the scheme by creating a new series of private funds under the names AI Capital ("AI Capital Funds") and Traders Point Capital ("Traders Point Funds"). Johnson sought to use the private funds to raise money, this time from institutional investors and through investment advisers, using the same purported FX trading strategy and misrepresentations about the BHC Funds' fictitious track record. As part of this new extension of the scheme, on September 11, 2026, Traders Point Capital, which is indirectly owned by Johnson and his wife, submitted an application to the SEC to register as an investment adviser, which is currently pending. By early October 2026, Traders Point Capital raised at least $5.5 million, and new Traders Point Funds have been created as recently as late October 2026.

8. From the more than $560 million that Backward Hat Capital, Williams, and Johnson have raised, Williams and Johnson have transferred many millions of dollars to Relief

Defendants Backward Hat Capital Fund LP ("Backward Hat Fund"), BHC V LLC ("BHC V"), KMAP, Inc. ("KMAP"), Allen Johnson Group LLC ("Allen Johnson Group"), William Harvey Group LLC ("William Harvey Group"), Droplight LLC ("Droplight"), and William Cody Harvey ("Harvey"). In addition, Relief Defendants Traders Point Capital FX Fund I ("Traders Point Fund I") and/or TPC FX AMF, LP ("TPC Fund") received millions in new investor funds raised by Traders Point Capital. The relief defendants named in this paragraph are collectively referred to herein as "Relief Defendants."

9. By engaging in the conduct alleged in this Complaint, Defendants have violated, and unless enjoined, are likely to continue violating: (a) Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a), (c)] thereunder (as to all Defendants); (b) Section 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1), (3)] (as to all Defendants); (c) Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder (as to Backward Hat Capital, Williams, Johnson, and Anderson); (d) Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)] (as to Backward Hat Capital, Williams, Johnson, and Anderson); (e) Sections 206(1) and (2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), (2)] (as to Williams); and (f) Advisers Act Section 207 [15 U.S.C. § 80b-7] (as to Traders Point Capital).

## PARTIES AND RELATED ENTITIES

### I. Defendants

10. **Backward Hat Capital Management LLC** is an Indiana limited liability company with its principal place of business in Kokomo, Indiana. Backward Hat Capital is the primary managing entity for the other Backward Hat-related general partner entities and the BHC Funds (the "Backward Hat Capital Entities and Funds") and received much of the

investors' money for the various BHC Funds, via bank accounts in the names of Relief Defendants Backward Hat Fund and BHC V. Williams, Johnson, and one of Williams's friends, Relief Defendant Harvey, co-founded Backward Hat Capital, and it is co-owned by Relief Defendant KMAP (Williams's entity) and William Johnson Group LLC ("William Johnson Group") (Johnson's and Harvey's entity).

11. **TPC MC, LLC d/b/a Traders Point Capital** is an Indiana limited liability company with its principal place of business in Indianapolis, Indiana. Traders Point Capital is owned by Johnson and his wife through a limited liability company. Traders Point Capital has a pending application with the SEC to be registered as an investment adviser. One related entity – Relief Defendant Traders Point Fund I – filed a Form D with the SEC on August 10, 2026 (and amended on October 9, 2026) for a $300 million offering, as to which it claimed it had already sold $4,482,000 in securities. Eight other Traders Point Funds were created in October 2026.

12. **Phillip P. Williams**, age 51, is a resident of Kokomo, Indiana. Williams is a co-founder of Backward Hat Capital. He jointly controls and serves as the registered agent for many of the various Backward Hat Capital Entities and Funds. Williams is also (i) the CEO and President of Relief Defendant KMAP (which is a joint owner of Backward Hat Capital); and (ii) the manager of Relief Defendant Droplight (which he co-founded with Anderson). Williams worked continuously for broker-dealers or investment advisers until January 2025 and was most recently an investment adviser representative for Investment Adviser A from April 2020 to January 2025.

13. **Devin A. Johnson**, age 29, is a resident of Zionsville, Indiana. Johnson is a co-founder of Backward Hat Capital. He jointly controls the various Backward Hat Capital Entities and Funds, and he also owns and controls, directly or indirectly, the various AI Capital/Traders

Point entities and funds (the "AI Capital/Traders Point Entities and Funds"). Specifically, Johnson is (i) the indirect owner of Traders Point Capital; (ii) the co-owner and co-manager of William Johnson Group (which is a joint owner of Backward Hat Capital); (iii) the owner and sole manager of Relief Defendant Allen Johnson Group; and (iv) the CEO of another entity in the business of providing sales/customer support automation ("Company 1"), which he co-founded with Harvey and others.

14. **Joseph Anderson**, age 47, is a resident of Westfield, Indiana. For much of the Relevant Period, Anderson was (but is not currently) the President and CEO of IpX. He is the CEO of Relief Defendant Droplight (which he co-founded with Williams).

## II. Relief Defendants

15. **Backward Hat Capital Fund LP** is an Indiana limited partnership operating as a pooled investment fund with a principal place of business in Noblesville, Indiana. It was created by Johnson and Williams who both serve as the officers and directors of the fund. Backward Hat Fund filed a Form D with the SEC on August 11, 2022. Backward Hat Fund is an account holder for one of the two main bank accounts that received the vast majority of investor funds. Backward Hat Fund is also the account holder for the main Backward Hat-related account at Coinbase.

16. **BHC V LLC** is an Indiana limited liability company with its principal place of business in Kokomo, Indiana. BHC V controlled a bank account into which a significant amount of investor funds was deposited. Williams is the signatory for this bank account and is the registered agent for BHC V. The corporate documents filed with the State of Indiana identify Williams as a Member of BHC V.

17. **KMAP Inc.** is an Indiana corporation with its principal place of business located at Williams's home address in Kokomo, Indiana. Williams is the founder, owner, and sole principal of KMAP. KMAP is a joint owner of Backward Hat Capital.

18. **Allen Johnson Group LLC** is an Indiana limited liability company with its principal place of business in Indianapolis, Indiana. Johnson is the founder, owner, and sole principal of Allen Johnson Group.

19. **William Cody Harvey**, age 36, is a resident of Bargersville, Indiana. Harvey – along with Johnson – is a co-owner of the William Johnson Group, which is a co-owner of Backward Hat Capital. Along with Johnson, Harvey is also the co-founder of Company 1.

20. **William Harvey Group LLC** is an Indiana limited liability company with its principal place of business in Indianapolis, Indiana. Harvey is the founder, owner, and sole principal of the William Harvey Group. William Harvey Group was administratively dissolved by the State of Indiana on February 5, 2026.

21. **Traders Point Capital FX Fund I LP** is an Indiana limited partnership operating as a pooled investment fund with a principal place of business in Indianapolis, Indiana. Traders Point Fund I filed a Form D with the SEC on August 10, 2026, and an amended Form D on October 9, 2026 for a $300 million offering with $4,482,000 sold as of the date of the amended filing.

22. **TPC FX AMF, LP** is an Indiana limited partnership with its principal place of business in Indianapolis, Indiana. In October 2026, the TPC Fund received $5.5 million of investor funds that were deposited with Traders Point Capital.

23. **Droplight LLC** is an Indiana limited liability company with its principal place of business located at Williams's home in Kokomo, Indiana. Droplight – which was founded by

Williams and Anderson – is a venture branding company (*i.e.*, it acquires, founds, and develops various brands). Anderson is the CEO of Droplight.

**III. Related Entities**

24. **Institute for Configuration Management d/b/a Institute for Process Excellence** is a Colorado corporation with its principal place of business in Denver, Colorado. IpX is a corporate training, professional certification and enterprise-change management consulting firm. Until recently, Anderson was the President and CEO of IpX.

25. **Company 1** is an Indiana corporation with its principal place of business in Indianapolis, Indiana. Company 1 was co-founded by Johnson and Harvey and is in the business of providing sales/customer support automation.

**<u>JURISDICTION AND VENUE</u>**

26. This Court has jurisdiction over this action pursuant to Securities Act Sections 20(b), 20(d), and 22(a) [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)]; Exchange Act Sections 21(d), 21(e), and 27(a) [15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a)]; and Advisers Act Sections 209(d) and 214(a) [15 U.S.C. §§ 80b-9(d) and 80b-14(a)].

27. Defendants, directly or indirectly, singly or in concert with others, made use of the means or instruments of transportation or communication in interstate commerce, the means and instrumentalities of interstate commerce, or of the mails, in connection with the acts, practices, and courses of business set forth in this Complaint.

28. This Court has personal jurisdiction over Defendants and Relief Defendants and venue is proper in the Southern District of Indiana pursuant to Securities Act Sections 20(b), 20(d)(1), and 22(a) [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)]; Exchange Act Sections 21(d) and 27 [15 U.S.C. §§ 78u(d) and 78aa]; Advisers Act Sections 209(d) and 214(a) [15 U.S.C. §§ 80b-9(d) and 80b-14(a)]; and 28 U.S.C. § 1391(b). This is because, among other reasons: (a)

Williams, Johnson, and Anderson have resided in this District during the Relevant Period; (b) at least 250 investors residing in this District have invested in the BHC Funds; (c) the principal offices of Backward Hat Capital, Traders Point Capital, Backward Hat Capital Fund, BHC V, KMAP, Allen Johnson Group, William Harvey Group, and Droplight have been located in this district; and (d) many of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this district.

## FACTUAL ALLEGATIONS

### I. Backward Hat Capital

#### A. Backward Hat Capital's Business and Founders

29. In 2022, Williams, Johnson, and Relief Defendant Harvey founded Backward Hat Capital to be the general partner of Relief Defendant Backward Hat Fund. As described in a Private Placement Memorandum ("PPM") dated July 20, 2022, Backward Hat Fund would purportedly trade in FX markets "via a software-based platform that has been programmed to trade when certain analytic patterns are identified."

30. In marketing materials for investors, Backward Hat Capital claimed that its "proprietary algorithmic technology" includes "ai implementation for data analysis" which allows the algorithm to take advantage of arbitrage opportunities in FX trading by "scan[ning] global forex markets in real-time, identifying and executing trades faster than any human could. This rules-based, emotion-free system operates around the clock, supported by macroeconomic insights from our leadership team."

31. At the time he co-founded Backward Hat Capital, Williams was an investment adviser at Investment Adviser A. Johnson's prior experience involved selling used sneakers and, in 2019, creating a company (a predecessor to Company 1) that allowed customers to do automated outreach on LinkedIn.

32. Backward Hat Capital identified Williams, Johnson, and Harvey as: (a) "executive officers" and "directors" of the BHC Funds in filings with the SEC on Form D, which is a notice that a company is selling securities without full registration; and (b) "founders" in marketing materials. In marketing materials, Backward Hat Capital touted Williams as its "Managing Partner" who maintained a Series 7 license, even though he has not held that license or been associated with a broker-dealer since 2020.

33. One email sent to a prospective investor in January 2026 said, "The ultimate responsibility for compliance and adherence to [Securities Act Rule] 506(b) exemption rests entirely with the Managing Partner, Phil Williams, who personally oversees all regulatory filings, investor eligibility, and adherence to no-solicitation rules."

34. Although there were other employees at Backward Hat Capital, Williams had final approval for new investors, and Williams controlled access to any information about claimed trading and investment performance.

**B. The BHC Funds**

35. Starting in July 2022 and continuing through the present, Backward Hat Capital, Williams, and Johnson have raised more than $560 million from more than 2,000 investors. Although investors were told they were investing in one or more of 25 purported BHC Funds, in reality investor money was commingled and never strictly segregated into separate accounts by fund. The vast majority of investor funds were received into bank accounts in the names of Relief Defendants Backward Hat Fund and BHC V.

36. Specifically, Backward Hat Capital, Williams, and Johnson, directly and through promoters and other Backward Hat-related entities, sold investors limited partnership interests (the "Limited Partnership Interests") in one or more of the 25 purported BHC Funds. The BHC

Funds were supposedly managed by different general partner entities of each of the respective BHC Funds, but in reality, Backward Hat Capital, which was controlled by Williams and Johnson, functioned as the primary managing entity for each of the BHC Funds.

37. The offering materials, including the PPMs, their appendices, and the Limited Partnership Agreements ("LPA"), made clear that the primary purpose of the BHC Funds was to trade foreign currency. For example, the first PPM, dated July 20, 2022, stated: "The Fund's investment objectives are to maximize the return on investment for the Limited Partners through capital appreciation by trading in the foreign exchange markets." This disclosure was contained in later BHC Funds' PPMs.

38. Appendices to the initial and later PPMs stated that each BHC Fund "focuses on trading Forex pairs utilizing our proprietary automation and algorithms to generate returns for the Limited Partners. Our automation focuses on trends, indicators, patterns, and other key metrics to optimize trading utilizing high frequency techniques in the foreign currency arena." The Appendices to the initial and later PPMs also stated that the BHC Funds partnered with various broker platforms "to facilitate our trades offering Limited Partners the highest levels of transparency, security, and best technology platform in the industry."

39. The LPAs for the BHC Funds, which were included as an Appendix to the PPMs, said that the purpose of each respective Fund was "to receive a return on investment (profits) generated from income and earned through the General Partner's activities in connection with foreign exchange trading solely to the extent permitted by applicable law."

40. The LPAs further stated that "[t]he General Partner shall be under a fiduciary duty to conduct the affairs of the Fund in the best interests of the Fund, including the safekeeping of all Fund funds and assets and the use thereof for the benefit of the Fund. The General Partner

shall at all times act in good faith and exercise due diligence in all matters relating to the conduct of the business of the Fund."

41. The BHC Funds' PPMs indicated that the general partner of each Fund would be compensated with an annual management fee of 2% of total capital contributed to the Fund and a performance fee of 20% on Fund profits.

42. The offering materials for the BHC Funds also made clear that they were ultimately managed by Williams and Johnson. For example, the initial PPM identified the general partner of the first BHC Fund (Relief Defendant Backward Hat Fund) as Backward Hat Capital, which is owned by KMAP (Williams's entity) and William Johnson Group (Johnson's and Harvey's entity). Later PPMs identified a general partner entity named after its respective enumerated BHC Fund. For example, the PPM for BH Capital Fund V LP identifies BH Capital Fund V Management LLC as the general partner for that fund.

43. The BHC Funds' PPMs said all inquiries about the Funds should be directed to either Johnson or Williams..

44. Williams signed the LPAs or directed a Backward Hat Capital employee to sign on his behalf.

### C. Representations to Investors by Backward Hat Capital, Williams and Johnson.

45. Williams and Johnson, acting through Backward Hat Capital, solicited investors to invest in the BHC Funds.

46. Initial investors in the BHC Funds included investment advisory clients of Williams at Investment Adviser A, employees of related companies, *e.g.*, Company 1 (Johnson's company), or individuals Johnson met through an entrepreneur networking organization.

47. Later, Williams and Johnson also used promoters from various parts of the country (sometimes referred to as "general partners" of a specific BHC Fund) to solicit and secure new investors. The promoters were compensated with a percentage of the 20% performance fee on profits for the money the promoters raised. Backward Hat Capital also operated a "BH Capital" website advertising the investment opportunity with a login portal for existing clients to access information and make service requests. The website also invited prospective investors to request access by contacting Backward Hat Capital.

48. Backward Hat Capital, Williams, and Johnson, directly and indirectly, told investors that: (a) their funds would be pooled with funds of other investors into one of the 25 purported BHC Funds, converted to crypto assets, and invested in FX markets; (b) a proprietary "AI-driven" algorithm would identify and execute high-frequency FX trading; and (c) the BHC Funds earned monthly gross returns of more than 6%. Backward Hat Capital, Williams, and Johnson, directly and indirectly, also told some investors that investment returns had been verified by an independent third-party through an audit report and a quality of earnings report.

49. For example, a document called "BH Capital In Depth Due Diligence Questions" stated that investors' capital would be pooled in bank accounts and then "converted to digital liquidity through Coinbase." Appendices to the PPMs also stated that investor funds would be initially deposited in bank accounts and then moved to wallets and converted to "bitcoin."

50. The initial Backward Hat Fund PPM and other early PPMs informed investors that the funds would use a broker platform referred to herein as "Platform 1" as the platform to facilitate FX trades. However, in June 2023, Platform 1 collapsed amidst lawsuits and allegations of fraud. Williams and Johnson told some investors that they lost millions of dollars of investors'

money as a result of the failure of Platform 1 but claimed that they personally paid the money back in order to demonstrate their credibility.

51. Later versions of marketing materials such as the "BH Capital In Depth Due Diligence Questions" document provided to investors disclosed that investor money would be converted to a crypto asset and then deployed through an alternative broker platform referred to herein as "Platform 2," which was "a regulated liquidity provider." According to that same document, Platform 2 would, in turn, facilitate FX trades utilizing the proprietary algorithm with a third broker platform ("Platform 3") providing "real-time risk analytics and operational oversight across the process." More recently, Backward Hat Capital told investors that it executed trades through a different platform ("Platform 4").

52. The BHC Funds' marketing materials represented to investors that the proprietary trading algorithm engaged in high-frequency trading by scanning global FX markets around the clock and using "AI-driven" analysis to identify FX arbitrage opportunities and automatically execute trades. For example, a document provided to investors titled "BH Capital: Algorithmic Currency Arbitrage for Accredited Investors" stated that a proprietary "rules-based" algorithm "scans global forex markets in real-time, identifying and executing trades faster than any human could." The "BH Capital" website stated that Backward Hat Capital "[f]ocuses on forex pair arbitrage using our proprietary automation and algorithm to generate returns."

53. The marketing materials provided to investors, such as "BH Capital In Depth Due Diligence Questions," also stated that only 2% to 3% of the total portfolio would be deployed in any one active position, with only 25% to 30% of the total fund deployed at any one time, with an average trade duration of less than a day, which Backward Hat Capital claimed limited the amount of capital at risk and protected investors against large losses.

54. Throughout the Relevant Period, in the "BH Capital In Depth Due Diligence Questions" and elsewhere, investors were told that the promoted trading strategy employed high-frequency trading, which consistently produced monthly gross returns of more than 6% (which equates to non-compounded annual gross returns of over 70%, and compounded annual gross returns of over 100%), and that since at least August 2023 the BHC Funds had ***never*** had a month with gross returns less than 6%.

55. Investors in the BHC Funds were given access to a portal that showed purported monthly returns from at least March 2024 through at least February 2026 ranging from 6.05% to 7.03%.

56. When some prospective investors asked to see more information about the BHC Funds, they were provided with a purported Quality of Earnings Report ("QoE") and/or one of at least two audit reports ("Audit Reports") allegedly performed by the "audit division" of a third-party entity, IpX. The QoE and the Audit Reports each claimed to provide independent verification of the stated investment returns and the operational integrity of the BHC Funds. Williams directed an employee to disseminate the QoE and Audit Reports to prospective investors.

57. As discussed in more detail below, IpX is not a financial audit firm, does not have an "audit division," and the QoE and Audit Reports were actually drafted by Anderson, who also had a significant financial interest in the BHC Funds. In fact, Anderson received approximately $2.5 million of investor funds (via Relief Defendant KMAP) during the Relevant Period.

## II. Backward Hat Capital, Williams, and Johnson Engaged in a Scheme to Defraud the BHC Funds' Investors and Misrepresented the BHC Funds' Investment Returns.

58. Throughout the Relevant Period, Williams and Johnson, acting through Backward Hat Capital, engaged in a fraudulent scheme whereby they raised more than $560 million from

investors, transferred more than $220 million to themselves, made over $250 million in Ponzi-like payments to investors, and paid over $50 million to general partners/promoters to continue the scheme.

59. The vast majority of investor money raised by the BHC Funds flowed into only two bank accounts in the names of Relief Defendants Backward Hat Fund (controlled by Williams and Johnson) and BHC V (controlled by Williams). Backward Hat Capital, Williams, and Johnson commingled investor funds across all the BHC Funds in these two accounts, regardless of which specific BHC Fund raised the funds. Williams and Johnson misappropriated investor funds through these bank accounts, and through Coinbase accounts, and transferred funds among a number of Backward Hat entities' accounts. Williams and Johnson transferred roughly $220 million to the Backward Hat founders and/or their companies and made more than $250 million in Ponzi-like payments back to investors (from the BHC V account and a third bank account they controlled in the name of Backward Hat Capital).

60. In addition to the misappropriation of investor funds, as part of the scheme, Williams and Johnson, acting through Backward Hat Capital, made repeated material misrepresentations, through multiple means, about the use of investor funds, their historical trading returns, the source of the money returned to investors, and the involvement of IpX and its purported independence.

61. These misrepresentations were made in PPMs, promotional materials, email communications, presentations to prospective investors, investor account statements, the Audit Reports and QoE provided by Anderson allegedly by IpX, and on the "BH Capital" website. Investors and prospective investors also received false reporting of investment returns, including

through an online web portal, to entice them to make additional investments and lull them into keeping their investment in the funds.

**A. Misappropriation of Investor Funds**

62. During the Relevant Period, Williams and Johnson consistently used incoming investor money to enrich themselves and to make Ponzi-like payments to other investors, instead of using the funds as represented in the BHC Funds' marketing materials.

63. Williams and Johnson knew that investor funds were not being used as represented because they each controlled Backward Hat Fund's and Backward Hat Capital's bank accounts, and Williams controlled BHC V's bank account and Backward Hat Fund's Coinbase account, through which investor funds were deposited and transferred. Williams and Johnson then misappropriated and personally received tens of millions of dollars in bank and crypto asset transfers, which helped fund their lifestyle, including, among other things, exotic cars, expensive homes, and private air travel, and helped fund other unrelated businesses owned by Williams and Johnson. These funds also helped support Johnson's gambling.

64. From July 2022 to September 2025, approximately $109 million of the over $210 million raised was sent to Backward Hat Fund's Coinbase account and converted to crypto assets, which Williams, Johnson, and Backward Hat Capital told investors was the intermediary step before those funds could be used for FX trading.

65. Of the approximately $109 million in investor funds that were converted to crypto assets from July 2022 to September 2025, more than $56 million was transferred to the personal crypto assets accounts of Williams, Johnson, and Relief Defendant Harvey, and approximately $18 million was converted to U.S. dollars and transferred back to Backward Hat Capital's corporate bank account.

66. Approximately $40 million of the $109 million in investor funds that were sent to Coinbase during this period ultimately ended up at three platforms where some of those funds were used to buy and sell other crypto assets, but little to no money or crypto assets were used to trade FX.

67. During the more recent period (October 2025 to October 9, 2026), the scheme raised approximately $350 million and no investor funds whatsoever were transferred from Backward Hat accounts to Coinbase for conversion to crypto assets.

68. Over the entire period, more than 83% of investor money was used to make Ponzi-like payments to earlier investors or sent to Backward Hat's founders or their entities.

**B. Misrepresentations about the Investment Returns**

69. Throughout the scheme, Backward Hat Capital, Williams, and Johnson raised money and perpetuated the fraud by presenting existing and prospective investors with false investment returns.

70. Backward Hat Capital and Williams communicated these false returns to current investors on a monthly basis via an online portal they controlled which updated individual investor accounts with monthly gains in excess of 6%. Williams also authorized a Backward Hat Capital employee to email those false investment returns to prospective investors. Johnson made misrepresentations about the monthly returns, orally and in writing, when soliciting investors on behalf of Backward Hat Capital.

71. However, Backward Hat Capital, Williams, and Johnson knew, or were reckless in not knowing, that the information provided to investors reflecting earned gross monthly returns of 6% or more for every month the BHC Funds have existed was false.

72. Despite Williams, Johnson, and Backward Hat Capital's representations to investors that the BHC Funds never earned less than 6% in any month through profitable FX

trading, in reality the BHC Funds engaged in little to no FX trading. Moreover, the BHC Funds' own records did not reflect any returns for most of the BHC Funds between June and October 2023, and Backward Hat Capital had claimed to investors that they had lost $14 million in 2023 as a result of the collapse of Platform 1.

73. Because little to no actual FX trading occurred, profitable or otherwise, the vast majority of the over $250 million that was returned to investors came from new investor funds, not FX trading proceeds.

74. While the BHC Funds' tax returns for 2023 and 2024 reported some capital gains, those reported gains were far below the claimed returns represented to investors.

75. Backward Hat Capital is currently having trouble fulfilling investor redemption requests, which is also inconsistent with a strategy that allegedly produced monthly returns of 6% or more while only deploying up to 30% of capital.

## III. Backward Hat Capital, Williams, and Johnson Made Additional Material Misrepresentations and Omissions to Investors.

76. In furtherance of their fraud, Backward Hat Capital, Williams, and Johnson made additional material misrepresentations to the BHC Funds' investors and/or omissions that made their statements misleading.

77. Williams signed, or directed an employee to sign on his behalf, PPMs and the LPAs between Backward Hat Capital and the limited partners that contained multiple misrepresentations:

(a) For example, in or about December 2023, Williams signed a PPM and a LPA provided to an investor in what was purportedly a BHC Fund. Appendix E to the PPM was a purported "Business Summary" that lied about the business. The Appendix misrepresented that Backward Hat

Capital was using a proprietary high-frequency automated algorithm to trade FX and partnering with broker platforms "offering Limited Partners the highest levels of transparency, security, and best technology platform in the industry."

(b) The LPAs also contained misrepresentations that Backward Hat Capital shall be under a duty to conduct affairs in the best interests of the fund, including safekeeping funds, and shall at all times act in good faith and exercise due diligence.

(c) The LPAs further described how profits and losses would be allocated, which was false and misleading in light of the misappropriation of investor funds by Backward Hat Capital, Williams, and Johnson.

78. Williams also provided an employee with fake monthly investment returns and instructed him to upload those fake returns to the investor portal for distribution to investors.

79. As discussed above, Backward Hat Capital and Williams knew, or were reckless in not knowing, that the statements in the LPAs and the fake monthly investment returns on the portal were false and misleading since the vast majority of investor funds were being misappropriated or used for Ponzi-like payments. Williams had access to and controlled the bank and Coinbase accounts and purported trading platforms, approved and directed funds transfers, and misappropriated more than $147 million.

80. Johnson also made numerous misrepresentations to prospective and existing investors in the BHC Funds. For example, in one February 24, 2026 email to an existing investor, Johnson sent the fake QoE report (which validated fake returns and referenced the Fund's "algorithmic trading model") and represented that Backward Hat Capital had been

running its strategy "successfully for five years with consistent returns," and the trading was high volume but "[w]e do not put all assets at risk; only a controlled percentage is in active trades." Johnson continued in the email that the trading strategy was "built on the same disciplined approach, combined with proprietary technology that increases efficiency" as certain named notable investment institutions.

81. Johnson also represented in a subsequent email (which was still part of the same email discussion with the same investor) that only 20% of the BHC Funds would be traded at any one time with an average trade duration of 19.4 hours or less. After this correspondence, the investor made additional investments in the BHC Funds.

82. As discussed above, Johnson's description of the trading algorithm was false. In reality, instead of using a controlled percentage of investor funds for algorithmic high-frequency FX trading, those funds were primarily being misappropriated by the principals of Backward Hat Capital to enrich themselves or to make Ponzi-like payments.

83. Johnson, on behalf of Backward Hat Capital, also made misrepresentations about the monthly returns and the algorithm to an employee at Company 1 before the employee invested in the BHC Funds in April 2025.

84. As discussed above, Backward Hat Capital and Johnson knew, or were reckless in not knowing, that their statements about the trading algorithm and monthly returns were false and misleading since the vast majority of investor funds were being misappropriated or used for Ponzi-like payments and Johnson misappropriated over $45 million of investor funds.

## IV. Backward Hat Capital and Anderson Created and Used Fake Independent Audit Reports to Mislead Investors.

85. As described above, Backward Hat Capital (through its marketing materials) and Anderson (in the QoE and Audit Reports) misled investors and prospective investors by telling

them that IpX was the independent third-party auditor for one of the BHC Funds, BH Capital Fund I LP, and provided the QoE and Audit Reports purportedly issued by IpX that allegedly verified the BHC Fund's purported returns.

86. However, Backward Hat Capital and Anderson knew, or were reckless in not knowing, that the information provided to investors in and about the QoE and Audit Reports was false.

87. Anderson drafted the QoE, which purported to be an "in-depth analysis" of "BH Capital Fund's" performance from August 2024 to July 2025 by IpX, "Investment & Acquisition Readiness Specialists." However, according to IpX's website, it did not offer investment and acquisition readiness services. Nor could the QoE have been in-depth or "robust" as it claimed, "highlight[ing] the sustainability, consistency, and repeatability of fund performance," when the vast majority of investor funds had been either misappropriated or used for Ponzi-like payments. Likewise, the QoE's representations that "BH Capital Fund has established processes to identify, monitor, and mitigate risks across operational, regulatory, and market dimensions," and had "redundant security protocols and third-party oversight" to "reduce operational risk," were also false given the obvious misconduct by Williams and Johnson.

88. Anderson also drafted at least two purported Audit Reports – one for the period of January 2023 through July 2025 (the "2023 to 2025 Audit Report") and another for January 2025 through July 2025 (the "2025 YTD Audit Report").

89. The 2023 to 2025 Audit Report provided to investors claimed to be "independent" and performed by the "IpX Audit Division" consistent with Generally Accepted Auditing Standards and also claimed that the financial statements conformed to Generally Accepted Accounting Principles. The 2025 YTD Audit Report made the same representations but did not

reference the "IpX Audit Division." Instead, Anderson signed the 2025 YTD Audit Report as the CEO for IpX.

90. Each Audit Report represented that it cross-referenced investor statements with bank and brokerage confirmations to ensure balances were correct, gave specific attention to contributions, withdrawals, realized trading gains, and fee accrual accuracy, and tested key control processes.

91. The 2023 to 2025 Audit Report concluded that one of the BHC Funds, BH Capital Fund I LP, "maintained strong financial integrity, a disciplined control environment, and comprehensive recordkeeping practices" and its "reporting systems, documentation standards, and oversight mechanisms meet or exceed best practices for private fund administration and investor transparency." The 2025 YTD Audit Report conveyed similar conclusions regarding the "verification" of monthly gains and other key metrics based on "tie-outs to bank and brokerage statements for sampled periods." The QoE stated similar conclusions about Backward Hat Capital's operations and performance. These representations were false.

92. First, the bank records of Backward Hat Capital and its related entities, *e.g.*, Relief Defendants Backward Hat Fund and BHC V, are inconsistent with evidence of any investment returns as demonstrated by the minimal funds returned from Coinbase. Thus, Anderson could not have used those records to verify the consistent and improbable monthly returns reported to investors.

93. Likewise, Anderson could not have verified the claimed assets under management (AUM) of BH Capital Fund I LP through the fund's bank records. Both of those Audit Reports state that BH Capital Fund I LP had $246 million in assets under management (AUM) as of July 31, 2025 (the ending date for the relevant time periods of both Audit Reports), and that this

amount was verified through bank statements. However, the relevant bank account for BH Capital Fund I LP had a balance of just $1.00 on July 31, 2025, which is nowhere near the $246 million purportedly verified by the Audit Reports created by Anderson. In fact, the total of all transfers into that account during the relevant time period is less than $2.5 million.

94. Second, IpX is not an accounting firm, does not have an audit division, and does not perform financial audits. Moreover, the Audit Reports and QoE were drafted by Anderson, the former CEO of IpX who is not an accountant. Anderson also signed the 2025 YTD Audit Report.

95. Third, Anderson and IpX were not independent. Rather, Anderson is a close friend of Williams and a promoter of the BHC Funds. Anderson helped with the formation of Backward Hat Capital and told Johnson he expected to be richly compensated for his efforts. Moreover, Williams used investor money to help IpX make its payroll.

96. During the drafting process, Anderson sent a draft of the audit report to Johnson and another individual ("Individual A"). Individual A (copying Johnson) instructed Anderson on how to calculate earnings and gains.

97. In May 2026, after Backward Hat Capital failed to compensate Anderson as he expected, Anderson emailed Johnson and wrote: "Before discussing any future engagement structure, compensation model, or scope of work, I believe it is necessary to address the significant amount of work, value creation, introductions, and commitments that remain unresolved from the past several years. As you are aware, both personally and through IpX, I have performed extensive services for you, BH Capital . . . [Company 1], numerous General Partners within the BH Capital ecosystem, portfolio companies, investors, and strategic relationships that entered the ecosystem following direct discussions, introductions, and efforts

on my part." Anderson further noted that there is supporting documentation regarding, among other items, his "introductions" and "investor discussions."

98. Anderson went on to note that he had provided "strategic advisory services, investor introductions, GP introductions, enterprise relationship development, operational support, business development" and Backward Hat Capital had made "numerous commitments . . . regarding compensation, participation, allocations, economics, and long-term alignment" that Anderson believed would have resulted in $2 million in his Backward Hat Capital account.

99. Thus, Backward Hat Capital and Anderson knowingly or recklessly used the QoE and Audit Reports to mislead investors about IpX's independence and status as a financial auditor, and to lull existing investors and dupe prospective investors into believing BHC Funds' purported monthly returns had been independently verified. And Johnson and Williams, directly and indirectly through employees and/or assistants, provided these reports to existing and prospective investors despite the fact they knew or were reckless in not knowing that the reports contained these material misrepresentations and omissions.

## V. Williams Breached His Fiduciary Duties to His Clients.

100. Williams served as an investment adviser representative of a registered investment adviser, Investment Adviser A, from 2020 until he resigned in January 2025.

101. During that time, at least five of his clients at Investment Adviser A invested in BHC Funds.

102. Williams breached his fiduciary duty to those clients by investing them in a fraudulent offering and Ponzi-like scheme.

## VI. Johnson and Traders Point Capital Continued the Fraudulent Scheme Through the AI Capital and Traders Point Funds.

103. Starting in 2025, Johnson has attempted to expand the scheme beyond Backward Hat Capital and the BHC Funds by creating additional investment vehicles targeting institutional investors and investment advisers and their clients.

104. In 2025, Johnson, with the involvement of the CFO of Company 1, created a new investment vehicle, AI Capital. Johnson had ultimate authority over and controlled the contents of the promotional and marketing materials provided to AI Capital investors.

105. The AI Capital PPM described AI Capital as a "fund of funds" for the purpose of investing in other investment funds that employ "alternative investment strategies." But supplemental marketing materials provided to prospective investors made clear that AI Capital was running the same strategy as Backward Hat Capital and "earns primarily through profit-sharing on FX arbitrage gains." Johnson approached multiple investment advisers about offering AI Capital to their clients and told them that the strategy had historic monthly returns above 6% and they could expect similar returns going forward.

106. In promoting AI Capital to prospective investors, Johnson continued making misrepresentations about a purported proprietary algorithm which was used for FX trading.

107. For example, one marketing piece claimed that AI Capital's strategy was "High-Frequency, High Volume" with "Roughly $120M+ traded daily" so "Thousands of micro-trades compound to generate steady, market-neutral returns." Another marketing piece represented that, "Capital is deployed into the broker-connected trading environment [Platforms 2 and 3] for execution" and claimed, "The core quantitative model was developed entirely in-house and has been deployed in live market conditions for approximately six years, undergoing continuous refinement."

108. AI Capital was a new entity with no track record of its own. And to the extent these were representations relying upon the track record of the BHC Funds, these representations about the algorithm, volume of trading, track records, and use of funds were false.

109. Johnson also provided prospective AI Capital investors with the false IpX Audit Report about a BHC Fund and represented that "IpX conducts independent performance process audits to verify return accuracy." Johnson knew, or was reckless in not knowing, that the IpX Audit Reports were false and misleading because he had access to the bank records reflecting the actual use of the funds, had access to the BHC Funds' tax returns, which were inconsistent with the claimed returns in the Audit Reports, and knew or should have known that Anderson was not independent or qualified to perform audit work.

110. Johnson also misrepresented the amount of capital AI Capital had raised, falsely representing to at least one prospective institutional investor, on or about August 29, 2025, that AI Capital had already raised at least $60 million, when in fact it was at most a fraction of that amount.

111. In August 2026, to purportedly escape certain legal liabilities incurred by entities related to AI Capital, Johnson and the CFO of Company 1 established a new entity, Traders Point Capital, as a successor to AI Capital.

112. Traders Point Capital's website claimed that the firm runs "a coordinated portfolio of algorithmic trading systems across the G7 currencies."

113. On September 11, 2026, Traders Point Capital submitted an application to the SEC to register as an investment adviser, which is currently pending.

114. According to Traders Point Capital's Form ADV Part 2A Brochure ("Brochure") filed as part of its registration submission, the contents of which Johnson controlled, Traders

Point Capital would serve as the investment adviser to feeder vehicles investing in a master fund that would primarily engage in spot FX trading. Traders Point Capital reported that it does not yet have any assets under management but intends to raise $100 million within three months of the effective date of its registration.

115. The Brochure contains specific material misrepresentations and omissions. Although a Form ADV Part 2A requires an investment adviser to disclose "any conditions that are reasonably likely to impair its ability to meet contractual commitments," the Brochure does not disclose (a) Johnson – the owner of Traders Point Capital – and others were running a massive Ponzi-like scheme through the BHC Funds; (b) Johnson's affiliation with the Backward Hat entities; (c) Johnson and others personally misappropriated more than $220 million of investor funds; and (d) Traders Point Capital was premised upon the same fictitious business model as Backward Hat Capital and the BHC Funds that did not actually invest in FX as represented.

116. As another example, Item 8 of the Brochure requires disclosure of Traders Point Capital's "Methods of Analysis, Investment Strategies and Risk of Loss." Traders Point Capital's Brochure said it would seek to generate returns from income and capital appreciation through its management of the master fund "and its spot foreign exchange trading." It also indicated that Traders Point Capital "intends to utilize one or more trading algorithms to implement the investment strategy of the Master Fund." These were misrepresentations because Johnson purported to be relying on the algorithm Backward Hat Capital supposedly used to trade but which was not actually being used. In reality, Traders Point Capital was simply an extension of the Backward Hat Capital/AI Capital fraudulent scheme that had misappropriated investor funds and made Ponzi-like payments.

117. In Item 10 of the Brochure, "Other Financial Industry Activities and Affiliations," Traders Point Capital was required to "Describe any relationship or arrangement that is material to your advisory business or to your *clients* that you or any of your *management persons* have with any *related person* listed below." The list included pooled investment vehicles, commodity pool operators, and sponsor or syndicator of limited partnerships. In its Brochure, Traders Point Capital represented that it "has no relationships or arrangements with any related person listed in the instructions to Item 10.C. that are material to its advisory business or to the Feeders or their Investors." This was false, because it failed to disclose that Traders Point Capital's management was affiliated with AI Capital and Backward Hat Capital, and that Traders Point Capital purported to rely on a trading algorithm from Backward Hat Capital.

118. Item 18 of the Traders Point Capital's Brochure says that it "does not believe that there are any conditions that are reasonably likely to impair its ability to meet contractual commitments to the Feeders." This is not true, since Johnson knew he was running a massive fraudulent scheme, personally misappropriated tens of millions of dollars, and Traders Point was premised upon the same fictitious business model.

119. Finally, Item 7 of Form ADV requires registrants to "provide information about you and your *related persons*, including foreign affiliates." A related person was defined as "all of your advisory *affiliates* and any *person* that is under common *control* with you." Traders Point only disclosed "NFXI PHC LLC," one of the many subsidiaries controlled by Johnson, but omitted Johnson's affiliation with Backward Hat Capital, any of the BHC Funds, and AI Capital. Johnson's affiliation with these entities, and their role in a massive fraudulent scheme, would be highly material to clients of Traders Point Capital, and the omission was made with *scienter* given Johnson's control of these entities.

120. On October 9, 2026, Traders Point Fund I, a fund to be managed by Traders Point Capital, filed a Form D/A with the SEC that represented the fund was offering $300 million in securities, had 23 investors, and had raised approximately $4.5 million since a Form D filing on August 10, 2026. Through October 9, 2026, Traders Point Capital received $5.5 million from 28 investors, which it transferred to TPC Fund.

**VII. Williams and Johnson Transferred Investor Funds to Relief Defendants.**

121. From the more than $560 million that Backward Hat Capital, Traders Point Capital, Williams, and Johnson have raised, Relief Defendants Harvey, Backward Hat Fund, BHC V, KMAP, Allen Johnson Group, William Harvey Group, Traders Point Fund I, TPC Fund, and Droplight received many millions of dollars.

122. Backward Hat Fund received $385 million fraudulently obtained from the BHC Funds' investors. Backward Hat Fund has no legitimate claim to these funds.

123. BHC V received $180 million fraudulently obtained from the BHC Funds' investors. BHC V has no legitimate claim to these funds.

124. KMAP, a Williams-owned entity that is a part owner of Backward Hat Capital, received $93 million in net payments fraudulently obtained from the BHC Funds' investors. KMAP has no legitimate claim to these funds.

125. Allen Johnson Group, a Johnson-owned entity, received $41 million fraudulently obtained from the BHC Funds' investors. Allen Johnson Group has no legitimate claim to these funds.

126. Harvey received $3 million fraudulently obtained from the BHC Funds' investors. Harvey has no legitimate claim to these funds.

127. William Harvey Group, which is owned by Harvey, received over $27 million from the BHC Funds' investors. William Harvey Group has no legitimate claim to these funds.

128. Traders Point Fund I filed an October 9, 2026 Form D/A stating that it raised approximately $4.5 million from 23 investors. Any such money paid to the Traders Point Fund I was raised as part of Johnson's fraudulent scheme to expand to Traders Point Capital using the same false representations about the BHC Funds' returns. Traders Point Fund I has no legitimate claim to these funds.

129. TPC Fund received at least $5.5 million of investor funds from Traders Point Capital in early October 2026. TPC Fund has no legitimate claim to these funds.

130. Finally, Droplight, a Williams-controlled entity, received $31 million sourced from KMAP that was fraudulently obtained from the BHC Funds' investors. Droplight has no legitimate claim to these funds.

**VIII. Failed Redemptions Indicate the Scheme Is Near Collapse.**

131. Starting in September 2026 and continuing to the present, Backward Hat Capital, Williams, and Johnson have repeatedly delayed and/or failed to pay withdrawal requests to the BHC Funds' investors who requested them.

132. Specifically, as of October 9, 2026, Backward Hat Capital, Williams, and Johnson have failed to process withdrawal requests (some of those requests dating from August 2026).

133. Williams has repeatedly told investors that their distributions are imminent and have been delayed due to counterparty processing complications, but as of October 9, 2026, the Backward Hat Capital and the related bank accounts only held approximately $500,000.

## CLAIMS FOR RELIEF

### COUNT I

***Violations of Exchange Act Section 10(b) and Rule 10b-5(a) and (c) Thereunder (Against All Defendants)***

134. The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 133.

135. Defendants, directly or indirectly, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly: (i) employed one or more devices, schemes, or artifices to defraud; and (ii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

136. By engaging in the conduct described above, Defendants have violated and, unless restrained and enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)] thereunder.

### COUNT II

***Violations of Securities Act Section 17(a)(1) and (3) (Against All Defendants)***

137. The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 133.

138. Defendants, directly or indirectly, in the offer or sale of securities by the use of the means or instruments of transportation or communication in interstate commerce or the mails: (i) knowingly or recklessly employed one or more devices, schemes, or artifices to defraud; and (ii) knowingly, recklessly, or negligently engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

139. By engaging in the conduct described above, Defendants have violated and, unless restrained and enjoined, will again violate Securities Act Section 17(a)(1) and (3) [15 U.S.C. § 77q(a)(1) and (3)].

**COUNT III**

***Violations of Exchange Act Section 10(b) and Rule 10b-5(b) Thereunder***
***(Against Backward Hat Capital, Williams, Johnson, and Anderson)***

140. The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 133.

141. Backward Hat Capital, Williams, Johnson, and Anderson, directly or indirectly, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly made untrue statements of a material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

142. By engaging in the conduct described above, Backward Hat Capital, Williams, Johnson, and Anderson have violated and, unless restrained and enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

**COUNT IV**

***Violations of Securities Act Section 17(a)(2)***
***(Against Backward Hat Capital, Williams, Johnson, and Anderson)***

143. The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 133.

144. Backward Hat Capital, Williams, Johnson, and Anderson, directly or indirectly, in the offer or sale of securities by the use of the means or instruments of transportation or

communication in interstate commerce or the mails, knowingly, recklessly, or negligently obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

145. By engaging in the conduct described above, Backward Hat Capital, Williams, Johnson, and Anderson have violated and, unless restrained and enjoined, will again violate Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

**COUNT V**

***Violations of Advisers Act Sections 206(1) and 206(2)***
***(Against Williams)***

146. The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 133.

147. From at least July 2022 until January 2025, Williams was an investment adviser as defined in Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].

148. Williams, by use of the mails or any means or instrumentality of transportation or communication in interstate commerce, directly or indirectly: (i) knowingly or recklessly employed one or more devices, schemes, or artifices to defraud any client or prospective client; and (ii) knowingly, recklessly, or negligently engaged in one or more transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon any client or prospective client.

149. By engaging in the conduct described above, Williams has violated and, unless restrained and enjoined, will again violate Advisers Act Sections 206(1) and 206(2) [15 U.S.C. § 80b-6(1) and (2)].

**COUNT VI**

***Violations of Section 207 of the Advisers Act***
***(Against Traders Point Capital)***

150. The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 133.

151. Traders Point Capital, by use of the mails, and the means and instruments of interstate commerce, directly and indirectly, willfully made untrue statements of material fact and willfully omitted material facts in a registration application or report filed with the SEC under the Advisers Act.

152. By engaging in the conduct described above, Traders Point Capital has violated and, unless restrained and enjoined, will again violate Advisers Act Section 207 [15 U.S.C. § 80b-7].

**COUNT VII**

***Disgorgement From Relief Defendants***
***(Against All Relief Defendants)***

153. The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 133.

154. Each Relief Defendant received money, property, and assets that are the proceeds, or are traceable to the proceeds, of the fraud and violations of the securities laws by Defendants.

155. Relief Defendants have no legitimate claim to this property. In equity and good conscience, Relief Defendants should not be allowed to retain such funds.

156. As a result, Relief Defendants are liable for disgorgement and unjust enrichment and should each be required to return their share of ill-gotten gains, in an amount to be determined by the Court.

## RELIEF REQUESTED

**WHEREFORE**, the Commission requests that the Court:

**I.**

Find that Defendants committed the violations charged and alleged herein.

**II.**

Enter Orders of Permanent Injunction restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with Defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from violating, directly or indirectly, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a), (c)] thereunder, and Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §§ 77q(a)(1), (3)] by committing or engaging in specified actions or activities relevant to such violations.

**III.**

Enter Orders of Permanent Injunction restraining and enjoining Backward Hat Capital, Williams, Johnson, and Anderson, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with Backward Hat Capital, Williams, Johnson, and Anderson who receive actual notice of the Order, by personal service or otherwise, and each of them from violating, directly or indirectly, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder, and Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)] by committing or engaging in specified actions or activities relevant to such violations.

**IV.**

Enter an Order of Permanent Injunction restraining and enjoining Williams, his officers,

agents, servants, employees, attorneys and those persons in active concert or participation with Williams who receive actual notice of the Order, by personal service or otherwise, and each of them from violating, directly or indirectly, Advisers Act Sections 206(1) and (2) [15 U.S.C. §§ 80b-6(1), (2)] by committing or engaging in specified actions or activities relevant to such violations.

**V.**

Enter an Order of Permanent Injunction restraining and enjoining Traders Point Capital, its officers, agents, servants, employees, attorneys and those persons in active concert or participation with Traders Point Capital who receive actual notice of the Order, by personal service or otherwise, and each of them from violating, directly or indirectly, Advisers Act Section 207 [15 U.S.C. § 80b-7].

**VI.**

Enter Orders of Permanent Injunction permanently prohibiting each of Williams, Johnson, and Anderson from, directly or indirectly, including, but not limited to, through any entity owned or controlled by them, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent them from purchasing or selling securities for their own personal accounts.

**VII.**

Enter Orders of Permanent Injunction permanently prohibiting each of Williams, Johnson, and Traders Point Capital from, directly or indirectly, acting as or being associated with any broker, dealer, or investment adviser. For purposes of such injunction, a person is associated with an investment adviser if such person is a partner, officer, or director of such investment adviser (or performs similar functions), or, directly or indirectly controls or is controlled by such

investment adviser, including any employee of such investment adviser; and a person is associated with a broker or dealer if such person is a partner, officer, director, or branch manager of such broker or dealer (or occupies a similar status or performs similar functions), directly or indirectly controls, is controlled by, or is under common control with such broker or dealer, or is an employee of such broker or dealer.

**VIII.**

Issue an Order requiring Defendants and Relief Defendants pursuant to Exchange Act Sections 21(d)(3), (d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), (d)(5), (d)(7)] to disgorge all ill-gotten gains received, directly or indirectly, as a result of the violations alleged in this Complaint, including prejudgment interest. In addition, issue orders finding that (a) Backward Hat Capital, Williams, and Johnson are jointly and severally liable for disgorgement with prejudgment interest, except that Williams and Backward Hat Capital shall not be jointly and severally liable in connection with any disgorgement and prejudgment interest ordered against Johnson in relation to Traders Point Capital, Traders Point Fund I, or TPC Fund; with Williams, Johnson, and Backward Hat Capital also jointly and severally liable for any disgorgement with prejudgment interest ordered against any of: Backward Hat Fund, BHC V, KMAP, Droplight, and the Allen Johnson Group; and (b) Johnson and Traders Point Capital are jointly and severally liable for disgorgement with prejudgment interest, with Johnson and Traders Point Capital also jointly and severally liable for any disgorgement and prejudgment interest ordered against Traders Point Fund I or TPC Fund.

**IX.**

With regard to the Defendants' violative acts, practices and courses of business set forth herein, issue an order imposing upon Defendants appropriate civil penalties pursuant to

Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)] (as to Williams and Traders Point Capital only).

**X.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of the Court.

**XI.**

Grant such other relief as the Court deems appropriate.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff SEC hereby requests a trial by jury on all claims so triable.

Dated: November 17, 2026

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

*/s/ Alyssa Qualls*
Alyssa Qualls (IL Bar No. 6292124)
BeLinda Mathie (IL Bar No. 6275461)
Jake Schmidt (IL Bar No. 6270153)
Jonathan Katz (IL Bar No. 6275244)
175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
(312) 353-7390
(312) 353-7398 (FAX)
QuallsA@sec.gov

***Attorneys for Plaintiff United States Securities and Exchange Commission***